In the United States District Court
for the District of Kansas

_____

Case No. 20-cr-40012-TC

_____

UNITED STATES OF AMERICA,

*Plaintiff*

v.

ROBERT L. COOPER,

*Defendant*

_____

## MEMORANDUM AND ORDER

Robert L. Cooper is charged with one count of aggravated sexual abuse under 18 U.S.C. § 2241(c) and one count of abusive sexual contact under 18 U.S.C. § 2241(a)(1). Doc. 1 at 1–2. Cooper moves to suppress photographed text messages, evidence from pretextual phone calls, and statements made to law enforcement. Doc. 14. For the following reasons, the Motion is denied.

## I

### A

In 2016, Cooper was married to Master Sergeant Megan Browning, an active duty soldier, and living in her home on the Fort Riley Military Installation, Ft. Riley, Kansas. Tr. 1:4:9–22. While Browning was deployed overseas, Cooper remained in her home with her three daughters. Tr. 1:8:17–9:5, 1:35:8–10.

After Browning returned from her deployment, Cooper and Browning's marriage deteriorated. They ultimately divorced in July 2017. Tr. 1:19:17–22. Shortly thereafter, one of Browning's daughters, K.B., informed Browning via text that—while Browning was deployed—Cooper sexually abused her in the bed that Cooper and Browning had shared. Ex. 7. Browning reported her daughter's

allegations to law enforcement. Tr. 1:4:24–25. U.S. Army investigators intervened and investigated because the alleged abuse took place on the Fort Riley base. *See* 18 U.S.C. § 7(3). The grand jury returned a two-count indictment against Cooper on March 4, 2020. Doc. 1.

**B**

Cooper moves to suppress evidence gathered during the investigation. Doc. 14. The following is a summary of the underlying facts that are relevant to Cooper's arguments and supported by the testimony and evidence submitted at the April 7, 2021, evidentiary hearing.

**1.** Cooper seeks to suppress two sets of images of text message exchanges between Browning and K.B. that were discovered during the criminal investigation. Doc. 14 at 1, 10–11. These images are screenshots of those text discussions. *See, e.g.*, Ex. 7.

Investigators collected the first set of photographs the day after Browning reported the allegations. Doc. 14 at 3. During this interview, investigators requested to conduct a "logical extraction" of Browning's phone data. Doc. 16 at 2; Tr. 1:44:8–9. Browning initially consented, but later revoked consent after waiting a few hours. Tr. 1:40:2–9. The Government estimated the process could take as long as 24 hours, and Browning explained that she was in the process of moving to another city and could not be without her phone for that period of time. Doc. 14 at 4; Tr. 1:39–40. In light of her revoked consent, investigators instead took screenshots of the text messages between K.B. and Browning that detailed the alleged abuse and returned the phone to Browning. Tr. 1:40:2–9; *see* Ex. 7.

The second set of photographs were taken almost a year later when Browning consented to investigators extraction of data from K.B.'s phone. Tr. 1:79:7–13. Her consent was limited to the images on K.B.'s phone, which included screenshots of K.B.'s text messages to Browning alleging Cooper's sexual abuse. Doc. 14-2.

There is no evidence (or argument) that the investigators ever downloaded those messages in their native format from the subject phones and saved them onto a government device. *See* Doc. 14 at 4, 5; Tr. 1:39:13–40:25, 1:44:1–2. Additionally, neither the Government nor Cooper have ever sought to subpoena or otherwise retrieve that information directly from either Browning's or K.B.'s phones. Tr. 1:65:1–

12. Instead, the question is whether the evidence available to the parties—*i.e.*, the screenshots of the texts—should be suppressed.

**2.** Cooper also seeks to suppress the contents of pretextual phone calls. In particular, U.S. Army investigator Agent Lisa Medrano encouraged Browning to call Cooper to confront him about K.B.'s claims while Medrano listened. Medrano took notes of the calls but did not otherwise record it. Tr. 1:6:23–25. According to Medrano, she did not record the call because government regulation required prior approval for recording, and she chose not to go through the hassle of seeking such approval. Tr. 1:14:3–9. Instead, Medrano prepared a formal report from the notes she took. Tr. 1:6:23–1:7:17. Both those notes and her report have been produced to Cooper. Exs. 5 & 5A.

**3.** Finally, Cooper contends that his statements to investigators were involuntary. Doc. 14 at 15–16 (citing *Jackson v. Denno*, 378 U.S. 368, 376 (1964)). During the Government's investigation, investigators sought to interview Cooper. *See generally* Ex. 10. Cooper agreed to meet a U.S. Army investigator, Agent David Ellis, at the Riley County Police Department in Manhattan, Kansas. Tr. 1:46–47. The entire interview was recorded, and the parties submitted a video recording of that interview without objection at the suppression hearing. *See* Ex. 10.

In the video, Ellis and Cooper appear in an interview room seated at a table. Ex. 10. at 5:48. Cooper is in his own clothing, unrestrained, and is seated near the door with no obstructions preventing his departure. *Id.* Before Ellis began asking Cooper questions, Ellis not only provided Cooper with a form that advised Cooper that he was being questioned about sexual abuse of a child, detailed his rights, including the familiar *Miranda* warnings, and noted that he was free to leave or discontinue the interview, but he also verbally explained those items to Cooper. *Id.* at 17:22–21:23. Cooper signed the certificate after Ellis' explanation, acknowledging that he understood his rights and was choosing to speak with Ellis about the allegations against him. *Id.* at 21:30–1:15:55; *see* Ex. 9.

The interview began cordially but eventually turned to Cooper's relationship with K.B. and Browning, as well as K.B.'s allegations. Ex. 10 at 21:30–1:15:55. About an hour into the interview, Ellis started to ask about statements Cooper made in the pretextual phone calls with Browning. *Id.* at 1:15:12–53. In response, Cooper invoked his right to an attorney. *Id.* at 1:15:55. Ellis immediately ceased his questioning and logged the time. *Id.* at 1:15:58–16:17. Ellis then explained to Cooper

he was not under arrest and walked Cooper out of the station. *Id.* 10 at 1:22:50–24:00.

## II

Cooper's motion to suppress makes three essential arguments. He first contends that the screenshots and information from the pre-textual phone calls should be suppressed because of how the Government perserved (or failed to preserve) the information. He next contends that the screenshots are separately improper because admitting them would violate the best-evidence rule. And finally, he contends that statements he made during the investigation were involuntary. As discussed in greater detail, all three arguments fail.

## A

Cooper asserts that the Government's preservation of the text messages by use of screenshots and failing to make an audio recording of the pretextual phone calls violated his due process rights under the Fifth Amendment. Doc. 14 at 6. That argument is rejected.

The Due Process Clause obligates the Government to both pre-serve and provide exculpatory evidence to a criminal defendant. *See generally Brady v. Maryland*, 373 U.S. 83, 87 (1963). Failure to preserve evidence violates due process if the evidence was exculpatory and its exculpatory value was apparent before its loss—at least where the evidence was of such a nature "that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488–89 (1984). "If, however, the exculpatory evidence was not apparently exculpatory but merely 'potentially useful,' the failure to preserve the evidence does not violate due process 'unless [the] criminal defendant can show bad faith on the part of the police.'" *United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Cooper's motion fails for several reasons. For one thing, it is not entirely clear that the evidence was lost or is currently missing. The agents testified that investigators obtained a screenshot of Browning's phone in July 2017 and then obtained similar screenshots of K.B.'s phone approximately one year later. At the suppression hearing, there was no indication that, even today, any of these phones (or their contents) have been lost or are not currently available through subpoena.

For another, Cooper's concern appears to be the manner and medium in which the Government chose to preserve the information. In other words, rather than taking screenshots and handwritten notes during the phone calls (that he participated in), Cooper wishes the Government had downloaded the text message history between Browning and K.B. and obtained the authority to get an audio recording of the calls. Doc. 14 at 4, 9–10. Yet, Cooper provides no authority suggesting that due process requires these particular investigative techniques.

And, most importantly, Cooper has not shown that the evidence was apparently exculpatory. *But see Harry*, 816 F.3d at 1276 (noting defendant bears the burden of showing missing evidence was known by the Government to be exculpatory). Rather, the testimony and argument presented at the hearing suggests that, at best, the native text message format and an audio recording *might* have been exculpatory. Even that is a stretch, at least with regard to the phone calls, as Cooper did not argue any inconsistency between the notes and report that Medrano made of the calls and his recollection of it. Nonetheless, Cooper's speculation and conjecture of what might have been shown fails to demonstrate apparent culpability. *See id.* at 1278.

*Youngblood* teaches that the loss of potentially useful information can be a due process violation if the criminal defendant can show government agents acted in bad faith. 467 U.S. at 58. Even assuming the potentially useful information he seeks is unavailable, Cooper makes no claim that bad faith was at work here. Doc. 17 at 3; Tr. at 1: 67:8–20. The investigators testified as to what they did and why. Tr. 1:3:10–1:46:7. There was no suggestion, even on cross-examination, that anything untoward was afoot. As a result, Cooper's claim fails.

**B**

Cooper also seeks a ruling that the Government cannot use the text message screenshots because doing so violates the best-evidence rule. Doc. 14 at 12–14 (referring to Fed. R. Evid. 1002). That argument, too, fails.

Under Rule 1002, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." There are, however, several exceptions. For example, Fed. R. Evid. 1003 provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is

raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Additionally, an original is unnecessary and other evidence is admissible to prove the contents of a writing, recording, or photograph under Fed. R. Evid. 1004(a) if "all the originals are lost or destroyed, and not by the proponent acting in bad faith."

Both exceptions undermine Cooper's best-evidence argument. In particular, Rule 1003 permits the photographs because Cooper does not dispute the screenshots' authenticity or identify any circumstances that would make it unfair to admit them. *United States v. Phillips*, 543 F.3d 1197, 1204 (10th Cir. 2008) (upholding admission of duplicated documents because the defendant failed to challenge authenticity when admitted). Accepting Cooper's proposition that the original text messages have been lost, Rule 1004 would still permit the screenshots' introduction because, as noted in Part II.A. *supra*, there is no evidence that investigators lost or destroyed the text messages on Browning's or K.B.'s phones in bad faith. *United States v. Shoels*, 685 F.2d 379, 384 (10th Cir. 1982) (affirming admission of photographed checks because there was no bad faith on part of the government); *United States v. Burnett*, Case No. 98-6224, 1999 WL 569055, at *5 (10th Cir. 1999) (upholding admission of duplicates absent any evidence or suggestion that the police destroyed documents in bad faith). Thus, Cooper's request to exclude the text message screenshots is denied.

## C

Finally, Cooper challenges the voluntariness of his statements (presumably, though it is not entirely clear, from both his interview with Ellis and the pretextual calls with Browning). Doc. 14 at 15–16 (invoking his right to a hearing under *Jackson v. Denno*, 378 U.S. 368 (1964) and 18 U.S.C. § 3501(a)). Based on the testimony adduced, exhibits admitted, and the arguments advanced, there is no basis to believe Cooper's statements were anything but voluntary.

A defendant's statements or confessions must be the product of his or her own "free and unconstrained choice." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973). When a defendant challenges the voluntariness of his statements, the government bears the burden of showing, by a preponderance of the evidence, that the confession was voluntary. *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). Voluntariness is determined by the totality of the circumstances. *Id.* Such factors

include: (i) the age, intelligence, and education of the defendant; (ii) the length of detention; (iii) the length and nature of questioning; (iv) whether the defendant was advised of his constitutional rights; and (v) whether the defendant was subjected to physical punishment. *Id.* (quoting *United States v. Toles*, 297 F.3d 959, 965–66 (10th Cir. 2002)).

The Government has shown that Cooper's statements to law enforcement were voluntary. Cooper was not arrested or in custody before, during, or immediately after the interview. Instead, he agreed to meet Ellis at the Riley County Police Department. Tr. at 1:46–47. Cooper was an educated adult at the time of the interview. Ex. 10 at 11:53–13:50. Based on the video, Cooper appears alert and healthy and at no time discusses any health concerns. *See generally id.* Ellis properly informed Cooper of his constitutional rights before Cooper signed a rights waiver, indicating that he wished to proceed with the interview. *Id.* at 21:23–30; Ex. 9. The interview lasted approximately 75 minutes and immediately stopped when Cooper invoked his right to counsel, Ex. 10 at 1:15:55–16:17, at which point he was free to leave, *id.* at 1:23–24. These circumstances show Cooper's statements were voluntarily made. *See, e.g., United States v. Smith*, 606 F.3d 1270, 1275–77 (10th Cir. 2010) (affirming statements were voluntarily made by a 21-year-old defendant with some high school education after having been in custody for over three hours).

To the extent Cooper challenges the voluntariness of his statements during the pretextual calls, the Government has also satisfied its burden to establish their voluntariness. When Browning first called, Cooper did not answer. Tr. 1:9:22–10:8. Cooper called Browning back, and the phone call lasted 25 to 30 minutes. Tr. 1:10:10. Browning hung up on Cooper, and Cooper again called Browning back. Tr. 1:10:11–22. This phone call lasted only 12 to 14 mintues. Tr. 1:10:25. Cooper was not informed of his rights, but doing so was unnecessary because he was not in custody. Tr. 1:5:10–11, 1:9:5–9; *United States v. Goebel*, 959 F.3d 1259, 1269 (10th Cir. 2020) ("A *Miranda* warning is required only when a defendant is in custody."). Accordingly, Cooper's statements made during the phone calls to Browning were voluntary. *See, e.g., Goebel*, 959 F.3d at 1268–69 (finding defendant's statements made to an officer on the sidewalk voluntary because he was not in custody).

### III

Cooper's  Motion to Suppress (Doc. 14) is DENIED.

IT IS SO ORDERED.


Date:  May 3 2021                    s/ Toby Crouse
                                     Toby Crouse
                                     United States District Judge